UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

─────────────────────────────────────

MICHAEL WEGNER,

                              Plaintiff,

              -vs-                                         08-CV-738-JTC

UPSTATE NIAGARA COOPERATIVE, INC.,
UPSTATE FARMS COOPERATIVE, INC., and
UPSTATE MILK COOPERATIVES, INC.,

                              Defendants.

─────────────────────────────────────

APPEARANCES:   BROWN & TARANTINO, LLP (KEVIN P. WICKA, ESQ., OF
               COUNSEL), Buffalo, New York, Attorneys for Plaintiff.

               HARTER SECREST AND EMERY LLP (ROBERT C. WEISSFLACH,
               ESQ., OF COUNSEL), Buffalo, New York, Attorneys for Defendant.


        Plaintiff Michael Wegner brought this action against defendant Upstate Niagara

Cooperative, Inc. ("Upstate Niagara")[1] alleging discrimination in employment based on his

disability, in violation of the Americans With Disabilities Act of 1990 ("ADA"), as amended,

42 U.S.C. § 12101 et seq., and New York State Human Rights Law ("NYSHRL"), N.Y.

Exec. Law § 290 et seq.  Defendant moves for summary judgment dismissing the action,

pursuant to Rule 56 of the Federal Rules of Civil Procedure.  For the reasons that follow,

defendant's motion is granted.

───────────────────────

        [1]Upstate Niagara Cooperative, Inc. was formerly known as Upstate Farms Cooperative, Inc., and
before that, as Upstate Milk Cooperatives, Inc.  See Item 49-36 (Deft. Local Rule 56 Statement), ¶ 6.

## BACKGROUND

The following facts, adapted from the parties' respective Local Rule 56 Statements, declarations, and exhibits attached thereto (see Items 49, 57-60), are not in dispute.

Upstate Niagara is a dairy cooperative owned by dairy farmers in the Western New York area.  Upstate Niagara markets and distributes a wide variety of dairy products including milk, yogurt, cottage cheese, ice cream mix, dip, and flavored milk-based beverages.  Plaintiff began working for Upstate Niagara in 1985, and held the position of Wholesale Driver since 1990.  From 2003 until February of 2006, plaintiff worked as a "Wegman's Relief Driver," delivering Upstate Niagara products to Wegman's Markets.  Item 49-36, ¶ 7; Item 60, ¶ 1, 7.

In February 2006, plaintiff was diagnosed with a non-work related, two-level cervical disc herniation causing spinal stenosis which resulted in an episode of temporary paralysis. *See* Item 60-6, p. 2.[2]  On February 20, 2006, plaintiff underwent C5-6 and C6-7 anterior cervical discectomy and fusion ("ACDF") surgery (*id.* at 6-8), requiring him to take New York State short-term disability leave until he received medical clearance to return to work. Item 49-2 (Keller Decl.), ¶ 12.

Progress notes from medical providers at University at Buffalo Neurosurgery indicate that on May 24, 2006, plaintiff was examined by Elad Levy, MD, who reported in a letter to plaintiff's primary care physician, Darren Caparaso, MD, as follows:

---

[2]Item 60-6 is the court's docket designation for Exhibit I, attached to Plaintiff's Local Rule 56 Statement (Item 60), which includes copies of plaintiff's medical records deemed admissible for the purposes of this motion pursuant to a Stipulation and Order entered on January 5, 2012 (Item  48).

> [Mr. Wegner] is doing well, but continues to have low back pain.  As far as cervical pain, it is improved since his cervical surgery.  He has been doing physical therapy and physical strengthening.  He has to get to a point where he can lift 55 pounds with his arms extending.  We do not feel that that requirement may ever be met, given the fact that he had a two-level discectomy and lifting that weight with arms extending may injure his cervical spine.

*Id.* at 9.

Dr. Levy saw plaintiff again on July 10, 2006, and reported to Dr. Caparaso that plaintiff "has recovered nicely, but still has a considerable amount of neck discomfort at times.  In his job for Upstate Milk, he has to lift heavy containers above his head and he cannot do that."  According to Dr. Levy, plaintiff was ready to return to work, but could not work at his old job.  Dr. Levy authorized plaintiff's return to work as of July 31, 2006, with a weight restriction of 20 pounds, no overhead lifting, and no significant neck extension. *Id.* at 11; *see also* Item 49-21, p. 3.

On July 12, 2006, plaintiff met with Richard Lipsitz, the Business Agent for Teamsters Local 264 (the "Union"), and Edward Porter, Upstate Niagara's Director of Transportation, to discuss plaintiff's options for returning to work under the medical restrictions recommended by Dr. Levy.[3]  Among the options discussed was the possibility that an Upstate Niagara Wholesale Driver working a route which required minimal lifting might consent to switch positions with plaintiff.  Employee consent was necessary because neither defendant nor the Union had the authority to remove an employee from a position

---

[3]Upstate Niagara has a Temporary Light Duty ("TLD") Program designed to accommodate employees returning to work from leave due to injury or illness, providing "temporary placement for employees who are temporarily unable to perform the full range of their regular job duties, but who have been released by their physicians to return to work in a limited capacity."  Item 49-18, p. 1.  Assignments to TLD are limited to 90 days (subject to exceptions approved by the Human Resources Department), and participation in the program is mandatory.  *Id.* at 1-2.

which had been awarded pursuant to the seniority bidding procedures set forth in the Collective Bargaining Agreement ("CBA") between Upstate Niagara and the Union (*see* Item 49-17).  Plaintiff contacted the four drivers identified as holding positions which might fall within his medical restrictions, but all four declined to switch positions with plaintiff.  *See* Item 49-36, ¶¶ 34-36; Item 60, ¶¶ 15-20; Item 59 (Wegner Decl.), ¶¶ 16-17.

As reflected in defendant's interoffice emails (Item 49-22), in early August 2006 Mr. Porter and Mr. Lipsitz discussed a proposal to offer plaintiff a temporary position as a "Cooler Checker" to provide quality control for distribution of products from the coolers at defendant's facility on Dale Road in Cheektowaga.  However, as the result of discussions at a series of meetings between Upstate Niagara and the Union, it was determined that the Cooler Checker position would require lifting and moving pallets and cases weighing up to 43 pounds, which was inconsistent with the weight restrictions imposed by plaintiff's physicians.  On August 15, 2006, plaintiff and Mr. Lipsitz met with Mr. Porter, Colleen Keller (defendant's Human Resources Manager), and Thomas Walker (manager of defendant's Dale Road facility) to further discuss plaintiff's employment status.  As a result of this meeting, it was agreed  that (among other things) plaintiff would retain his seniority rights for two years from the date of his disability (February 2006) and, if plaintiff's medical restrictions were revised during that time, defendant would review the revisions and consider them accordingly.  Item 49-22, p. 1.

In early November 2006, plaintiff's Wholesale Driver job was re-bid and awarded to another employee, in accordance with the terms of the CBA.[4]  Plaintiff retained his seniority bidding rights for another 15 months (*i.e.*, until February 2008).  Item 49-36, ¶ 43.

On November 7, 2006, Dr. Levy signed an updated medical restriction note indicating that plaintiff could return to work as of November 27, 2006, with a weight lifting limitation of 45 pounds and no repetitive lifting.  *See* Item 49-21, p. 4.  Upon receiving notice of this information, Patty Cookfair (Upstate Niagara's Corporate Safety Coordinator) contacted plaintiff to schedule a medical examination with HealthWorks-WNY, defendant's provider for Department of Transportation ("DOT") and company physicals.  The medical exam was conducted on November 16, 2006, by Dr. Stuart Dorfman.  Dr. Dorfman reported on a DOT Commercial Driver Fitness Determination form that plaintiff met the federal regulatory standards to qualify for a 2-year certificate to operate a commercial vehicle, while noting "mildly limiting [range of motion] to back" and "limited lifting to 45 [pounds]." Item 49-23, p. 3.  Dr. Dorfman also completed an Upstate Niagara "Physical Evaluation" form, noting  plaintiff's "permanent" restrictions on lifting more than 45 pounds, and repetitive bending and lifting.  Item 49-24, p. 3.  These restrictions placed plaintiff below Upstate Niagara's physical demand requirements set forth in both the Job Description for

---

[4]Article 24.4 of the CBA provides:

Personal and Injury/Illness Leaves of Absence:   By written agreement between the Company and the Union an employee may be granted a leave of absence without loss of seniority for the following reasons and periods:
…
b)        For involuntary absence due to inability to perform work - - not more than nine (9) months before job will be bid. … The employee will, however maintain his Company seniority for twenty-four (24) months.

Item 49-17, p. 12.

the position of Wholesale Driver, dated March 4, 1996  ("employee must regularly stack or unstack cases weighing 25 to 50 pounds to or from floor level to above shoulder height") (Item 49-19, p. 3; the "1996 Job Description"), and the "Essential Function" ratings for the Wholesale Driver and Cooler Worker positions, dated October 1997 ("Lifting – (Frequently above shoulder level) 25 - 55 lbs.") (Item 49-20, pp. 1-2).

On November 20, 2006, plaintiff contacted Upstate Niagara to inquire about the status of his return to work, leaving messages for Mr. Porter and Ms. Keller.  *See* Item 59, ¶ 26.  Mr. Porter called plaintiff the next day (November 21, 2006) and informed him that he would not be cleared to return to work on November 27, 2006 due to the company's concerns about his health.  *Id.* at ¶ 27.  Mr. Porter indicated that he would get back to plaintiff after further discussions with supervision.  *Id.*

On November 22, 2006, Mr. Porter met with Ms. Cookfair and Glenn Orser, an ergonomics advisor, to review the functional elements of the Wholesale Driver position. As a result of the meeting, the job description for the position was revised to reflect duties that had long been performed by drivers but had not been included in the 1996 Job Description (*see* Item 49-25, pp. 6-7; the "2006 Job Description"), and Mr. Orser was engaged to measure the forces necessary to perform some of those additional duties – including opening and closing the hood, turning the crank to raise and lower the trailer, and opening and closing the trailer doors.  *See id.* at 8.  On November 24, 2006, Mr. Orser met with Mr. Porter at the Upstate Niagara garage to conduct the measurements, and his report (along with supporting documentation and photographs) was transmitted to Ms. Cookfair by email dated November 26, 2006.  *Id.*  Ms. Cookfair then transmitted this updated information to Dr. Dorfman, who reviewed the material and advised Ms. Cookfair in a

telephone call on November 28, 2006 that he "stands firm" on his assessment of plaintiff's medical restrictions based on the DOT physical. *Id.* at 14.

On December 26, 2006, plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC"), *pro se*, claiming discrimination based on his disability in violation of the ADA.   Item 49-5.   Defendant responded by letter from Ms. Keller, dated January 17, 2007, stating as follows:

> After receiving Mr. Wegner's treating physician's statement increasing his lifting capability from 20 to 45 pounds, and after a discussion with the Union, Upstate sent Mr. Wegner for a DOT Physical Examination, and hired an Ergonomics expert (ERGO Works) to evaluate the duties Mr. Wegner would need to perform in the light duty job we had available.   We would offer him a 90 day temporary light duty job, as is our policy, if he could perform the light duties available within the capabilities assigned by his treating physician.
>
> The ergonomic evaluation showed that Mr. Wegner's physical capabilities (as assigned by his treating physician) were less than what was required to perform the light duty job available.   Therefore, Upstate could not offer Mr. Wegner the temporary light duty job.

Item 61-4, p. 8.

On January 18, 2007 (the day after defendant submitted its response to the EEOC Charge), plaintiff met with Mr. Porter and Ms. Keller from Upstate Niagara, along with Mr. Lipsitz and a Union steward (Joe Nowak), to discuss the availability of any light duty positions within plaintiff's medical restrictions.   Mr. Porter memorialized the matters discussed at this meeting in a letter to plaintiff dated February 28, 2008, confirming that plaintiff continued to maintain his original seniority date through February 4, 2008, along with his bidding rights, and that the company's delivery routes would be re-bid between March 15 and March 31, 2007.   *See* Item 49-27, p. 2.   Also discussed at the meeting was the agreement to have ErgoWorks evaluate the lifting components of a "Yard Jockey"

position which plaintiff had expressed an interest in bidding on.  *Id.*  Mr. Porter further

stated in the letter that:

> Upstate will require you to provide your most current medical capabilities
> prior to the bid being awarded to determine whether you will be able to
> perform the job you have bid on.  If your current capabilities prevent you from
> performing the duties of the job you have bid on, you will continue to be out
> on medical leave and the bid will be awarded to the next most senior qualified
> employee.

*Id.*

On March 9, 2007, plaintiff went to defendant's Dale Road facility to submit his bid

for the Yard Jockey position.  Mr. Porter was present at the facility, and plaintiff signed the

bid sheet in Mr. Porter's presence.  Mr. Porter asked plaintiff for his medical release, and

plaintiff told him that his restrictions had not changed since Dr. Levy's medical release

dated November 7, 2006 (45 lb. weight lifting limitation; no repetitive lifting).  As a result,

Mr. Porter immediately made the following notation on plaintiff's bid sheet: "Disqualified by

Medical Release dated 11/7/06."  *Id.* at 3.

Plaintiff followed up with a letter dated March 12, 2007, requesting written

confirmation (1) that his bid had been rejected due to his "permanent partial disability and

work restrictions" and (2) that he passed the DOT and company physicals.  *Id.* at 4.  Mr.

Porter responded by letter dated March 16, 2007, stating that the November 7, 2006

medical release relied upon by plaintiff "contained physical restrictions which prevented us

from awarding you the job you had bid on …," and that the DOT and company physicals

"did not address the post operative physical restrictions which your personal treating

physician assigned to your current level of recovery and physical capabilities."  *Id.* at 5.  Mr.

Porter further advised plaintiff that he was still considered to be an Upstate Niagara

employee covered by the CBA, and was entitled to return to work if in his treating physician's opinion his "physical capabilities improve[d] sufficiently to perform the minimum requirements of the job." *Id.* at 6.

On September 11, 2007, Dr. Levy's colleague Laura Mason, ANP-C, issued an updated release to work prescription stating that plaintiff "may return to work with lifting restriction of no greater than 75 lbs and no repetitive lifting." Item 49-21, p. 6. By letter dated October 2, 2007, plaintiff transmitted a copy of this release to Mr. Porter, and requested reinstatement to his former position. *Id.* at 5. Mr. Porter then wrote to Dr. Levy on October 25, 2007 requesting that he review the Job Description and Ergonomic Evaluation of plaintiff's Wholesale Driver position and "give me your medical opinion as to whether or not Mr. Wegner is capable of performing these duties without restriction." Item 49-28, p. 2.

On December 14, 2007, Elizabeth Carlson, Esq. (defendant's attorney with respect to the EEOC Charge) sent plaintiff's counsel Kevin Wicka, Esq., a letter advising that Upstate Niagara had not received a response to Mr. Porter's October 25, 2007 letter, and requesting that counsel "encourage Dr. Levy to comply with the Company's prior request to confirm if Mr. Wegner can perform the essential functions of the position of Wholesale Driver." Item 49-29, p. 2. Mr. Wicka responded by letter dated January 7, 2008, reiterating plaintiff's request to be reinstated to either his former position, the Yard Jockey position, or another available position. Item 49-30. With regard to Dr. Levy, Mr. Wicka stated "that asking Dr. Levy to respond to your ergonomics report is unreasonable and certainly not the standard which is used when returning an employee to work. Dr. Levy has issued his

restrictions and it is clear that [plaintiff] can perform the essential functions of the job for the positions list[ed] with reasonable accommodation." *Id.* at 1-2.[5]

In a letter to Mr. Lipsitz dated January 16, 2008, Ms. Keller requested that the Union extend plaintiff's seniority termination date of February 4, 2008, in order to allow him to bid on any position  subject to an anticipated notice of intent to re-bid jobs within his bargaining unit, "provided he has obtained a medical clearance and is physically capable of performing the essential functions of the job with or without restrictions." Item 49-32, p. 1.   This request was denied. *See id.* at 2.  Accordingly, by letter dated February 4, 2008, Ms. Keller advised plaintiff that, pursuant to Article 24.4(b) of the CBA, Upstate Niagara could no longer maintain his original seniority date of June 13, 1984, since he had been out of work for more than 24 months due to a non-work related injury.   Item 49-33.

On June 19, 2008, plaintiff filed an amended EEOC Charge (Item 49-6) to supplement the allegations in his original *pro se* Charge filed in December 2006, and to include allegations of conduct on the part of defendant occurring subsequent to that original filing.  On July 8, 2008, the EEOC issued a Dismissal and Notice of Rights letter advising plaintiff that its investigation of his allegations of disability discrimination had been

---

[5]During discovery in this case, plaintiff produced a letter from Dr. Levy dated November 4, 2007, and addressed to Mr. Porter, which stated as follows:

> I have received your letter regarding Mr. Michael Wegner returning to full duty without work restrictions.  I have reviewed the essential duties and responsibilities for the Job Code 03 in the Department of Distribution for a wholesale driver.  Upon review of the job description and the ergonomic evaluations, in answer to your question whether he is capable of performing these duties without restrictions, I would have to answer "no".  I feel that he has a lifting restriction of no greater than 75 lb. along with no repetitive lifting.  I feel that exceeding this weight with the occupation as described may injure his cervical spine.

Item 49-31.  This letter was never delivered to Mr. Porter, or to anyone at Upstate Niagara.  *See* Item 49-36, ¶ 68.

concluded, with the result that the information gathered failed to establish that plaintiff was a qualified individual with a disability within the meaning of the ADA.  *See* Item 49-7. According to the EEOC, the evidence obtained revealed that plaintiff was "not able to perform the essential functions of the positions that [defendant] sought as reasonable accommodations," including his current position as a driver; sales, supervisory and marketing positions; and the attempt to create the "checker" position.  *Id.* at 2-3.  This action followed.

Defendant moves for summary judgment dismissing the complaint in its entirety on the ground that the evidence in the record, developed as the result of administrative review and full discovery, fails to establish liability for disability discrimination under either the ADA or the New York Human Rights Law.  For the reasons that follow, defendant's motion is granted.

## DISCUSSION

I.  **Summary Judgment**

Rule 56 provides that, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Although the language of this Rule has been amended in recent years, the well-settled standards for considering a motion for summary judgment remain unchanged.  *See, e.g., Faulkner v. Arista Records LLC*, 797 F. Supp. 2d 299, 311 n. 7 (S.D.N.Y. 2011); Fed. R. Civ. P. 56, Committee's notes to 2010 amendments.  Under those standards, the moving party bears the initial burden of establishing that no genuine issue of material fact exists.  *Rockland Exposition, Inc. v.*

*Great American Assur. Co.*, 746 F. Supp. 2d 528, 532 (S.D.N.Y. 2010), *aff'd*, 445 F. App'x 387 (2d Cir. 2011).  A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law …."  *Id.*

Once the court determines that the moving party has met its burden, the burden shifts to the opposing party to "come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).  The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars showing that a trial is needed …."  *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotation marks and citation omitted), *quoted in Kaminski v. Anderson*, 792 F. Supp. 2d 657, 662 (W.D.N.Y. 2011).  In considering whether these respective burdens have been met, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments."  *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotation marks and citation omitted).

The Second Circuit has also held that, when deciding whether summary judgment should be granted in an employment discrimination case, the court "must take additional considerations into account."  *Desir v. City of New York*, 453 F. App'x 30, 32 (2d Cir. 2011)

(citing *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994)).  As stated in *Gallo*:

> A trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue.  Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.

*Gallo*, 22 F.3d at 1224.   Nonetheless, summary judgment remains appropriate in discrimination cases, as "the salutary purposes of summary judgment–avoiding protracted, expensive and harassing trials–apply no less to discrimination cases than to … other areas of litigation."  *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985); *see also Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."), *cert. denied*, 534 U.S. 993 (2001); *cf. D'Eredita v. ITT Corp.*, 370 F. App'x 139 (2d Cir. 2010) (affirming grant of summary judgment in favor of employer based on plaintiff's failure to show he could perform job with or without reasonable accommodation).

        In this case, defendant contends that summary judgment should be granted dismissing the complaint because plaintiff has failed to establish that he was disabled within the meaning of the ADA, and, upon dismissal of the federal claim on which the court's original jurisdiction is premised, the court should decline to exercise supplemental jurisdiction over plaintiff's state law claim.  The court first turns to an examination of the standards for establishing liability for discrimination in employment on the basis of disability, in violation of the ADA.

II.     **The ADA**

The ADA prohibits discrimination against any "qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Claims of employment discrimination brought under the ADA are subject to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to analyze claims brought under Title VII of the Civil Rights Act of 1964: the plaintiff must establish a *prima facie* case, the employer must then show that it had a legitimate, non-discriminatory reason for the adverse employment action, and the plaintiff must then show that the proffered reason is a pretext for discrimination.  *Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 169 (2d Cir. 2006); *Frontera v. SKF USA, Inc.*, 2010 WL 3241123, at *5 (W.D.N.Y. Aug. 16, 2010).

To establish a *prima facie* case of discrimination under the ADA, plaintiff must prove that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability.  *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001); *see also Kirkendall v. United Parcel Service, Inc.*, 964 F. Supp. 106, 109 (W.D.N.Y. 1997).

At the time of the events in question,[6] the term "individual with a disability" was defined in the ADA as:

> (A)  a physical or mental impairment that substantially limits one or more major life activities of [an] individual;
>
> (B)  a record of such an impairment; or
>
> (C)  being regarded as having such an impairment.

42 U.S.C. § 12102(1).

In evaluating whether an individual's impairment substantially limits a major life activity, courts consider "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2), *quoted in Weltz v. City of New York*, 2004 WL 1907309, at *5 (S.D.N.Y. Aug. 25, 2004); *see also Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 643 (2d Cir. 1998), *cert. denied*, 526 U.S. 1018 (1999).  Major life activities are "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

In this case, plaintiff claims that as a result of his cervical fusion, he is substantially limited in his ability to perform the major life activity of working.  As explained by the Second Circuit in *Giordano*:

---

[6]Because the events giving rise to plaintiff's ADA claim occurred prior to January 1, 2009 (the effective date of the ADA Amendments Act of 2008), the version of the statute in effect during the time period at issue applies.  *See Wega v. Center for Disability Rights, Inc.*, 395 F. App'x 782, 784 n. 1. (2d Cir. 2010) ("[T]here is no indication that Congress intended the ADA Amendments to have retroactive effect.").  Unless otherwise indicated, citations to the statutory provisions and regulations herein are to the versions in effect between February 2006 (the date of onset of plaintiff's alleged disability) and February 2008 (the date of expiration of plaintiff's seniority).

In general, an impairment substantially limits a major life activity if it renders a person either (i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner or duration under which an individual can perform that activity in comparison to the average person in the general population. But where, as here, the activity is working, the EEOC regulations define "substantially limits" more precisely:

> (i) The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

*Giordano*, 274 F.3d at 747-48 (internal alterations, quotation marks and citations omitted).

Plaintiff claims that his cervical fusion significantly limits his ability to perform any class of jobs that require him to lift over 75 pounds, or require repetitive lifting.[7]  In determining whether an individual is significantly restricted in the ability to perform a class of jobs or a broad range of jobs in various classes, a court may consider:

> (1) "the geographical area to which the individual has reasonable access"; (2) "the job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs)"; and/or (3) "the job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes)."

---

[7]Plaintiff contends that he is also limited in his ability to "look up." Item 56, p. 10.  However, the court finds no mention of this limitation, or other support for this contention, in any of the medical reports submitted to the record on summary judgment. *Cf. Baerga v. Hospital For Special Surgery*, 2003 WL 22251294, at *6 (S.D.N.Y. Sept. 30, 2003) (citing cases within the Second Circuit holding that a plaintiff cannot establish that he is disabled within the meaning of the ADA without offering medical evidence to substantiate the specific limitations to which he claims he is subject due to his condition).

*McDonald v. City of New York*, 786 F. Supp. 2d 588, 610 (E.D.N.Y. 2011) (quoting 29 C.F.R. § 1630.2(j)(3)(ii)(A)-(C)).

Plaintiff has presented no evidence regarding the geographical area to which he has access, or the number and types of jobs utilizing (or not utilizing) similar training, knowledge, skills or abilities within that geographical area.  Instead, plaintiff relies entirely on the restrictions imposed by his treating physician, Dr. Levy, as evidence of disqualification from "any class of jobs" that would require him to lift over 75 pounds or engage in repetitive lifting.  However, the court's review of the record reveals that, while Dr. Levy consistently confirmed plaintiff's restricted ability following the February 2006 surgery to perform the requirements of his former position as a Wholesale Driver, he did not disqualify plaintiff from engaging in other employment.  *See*, e.g., Item 49-35 (July 2006: "At this point he is ready to return to work, but cannot work at his old job."; October 2006: We do not feel he can return to his previous employment ….  However, other forms of employment may be reasonable.").  Indeed,  plaintiff has been working as a truck driver for various other companies since at least March 2007 (when he still maintained seniority rights with Upstate Niagara).  *See* Item 49-10, pp. 99-108.

Moreover, numerous courts have held that weight limitations and repetitive lifting restrictions similar to that claimed by plaintiff in this case are insufficient as a matter of law to establish a substantial limitation on the major life activity of working.  *See, e.g., McDonald*, 786 F. Supp. 2d at 609 (20 lb. lifting restriction due to cervical herniation insufficient to establish substantial limitation on ability to lift, work, or perform any other major life activity); *Skorup v. Modern Door Corp.*, 153 F.3d 512, 515 (7th Cir. 1998) (10 lb.

lifting restriction and inability to perform jobs that require repetitive pulling motion of the shoulder, without further evidence suggesting inability to perform a class of jobs or a broad range of jobs in various classes, insufficient to meet ADA's definition of a disability);  *Helfter v. United Parcel Service, Inc.*, 115 F.3d 613, 617-18 (8th Cir. 1997) (inability to perform sustained, highly-repetitive activities with either hand, or lift more than ten pounds frequently and twenty pounds occasionally, insufficient to create a genuine issue of fact as to whether plaintiff was significantly restricted in the ability to perform a class of jobs or a broad range of jobs in various classes); *Riley v. Potter*, 2011 WL 3841530,  (D.N.J. Aug. 25, 2011) (44 lb. lifting weight restriction with no repetitive lifting insufficient to establish disability under ADA; citing cases from 3d, 4th, 8th and 9th Circuits).

Plaintiff alternatively contends that he meets the ADA's definition of "individual with a disability" because defendant regarded him as having an impairment that substantially limited his ability to work.  An employee is regarded as having an impairment under the ADA if he:

(1)    has a physical or mental impairment that does not substantially limit a major life activity but is treated by a covered entity as constituting such limitation;

(2)    has a physical or mental impairment that substantially limits a major life activity only as a result of the attitudes of others toward such impairment; or

(3)    has none of the impairments defined [by the EEOC regulations] but is treated by a covered entity as having a substantially limiting impairment.

*Reeves v. Johnson Controls World Services, Inc.*, 140 F.3d 144, 153 (2d Cir. 1998) (citing 29 C.F.R.  § 1630.2(l)).

It is beyond dispute that Mr. Porter and other Upstate Niagara personnel regarded plaintiff as an individual with a disability.  *See, e.g.*, Item 60-7, p. 6 (Invitation to Self Identify, executed by plaintiff on August 2, 2006).  However, it is not enough for plaintiff to simply show that the employer regarded him as somehow disabled; "rather, the plaintiff must show that the employer regarded the individual as disabled within the meaning of the ADA."  *Roberts v. Health Ass'n*, 308 F. App'x 568, 570 (2d Cir. 2009) (citing *Colwell v. Suffolk County Police Dept.*, 158 F.3d 635, 646 (2d Cir. 1998), *cert. denied*, 526 U.S. 1018 (1999)).  Thus, in order to prevail, plaintiff is required to come forward with evidence showing that Upstate Niagara regarded him as having an impairment that substantially limited the major life activity of working.  *Colwell*, 158 F.3d at 646.  This plaintiff has failed to do.

Plaintiff relies upon an "Invitation to Self-Identify" from, dated August 2, 2006, which he submitted to Upstate Niagara to identify himself as an "Individual with a Disability" (Item 60-7, p. 6), along with deposition testimony from Mr. Porter and Ms. Keller, as evidence that defendant was aware of plaintiff's work restrictions and treated him as substantially limited in his ability to work under those restrictions.  *See* Item 56, pp. 11-12.  However, the court's review of this evidence reveals that, at most, Upstate Niagara regarded plaintiff as having medical restrictions precluding him from returning to the Wholesale Driver position. There is nothing in the record before the court to support a reasonable inference that Upstate Niagara considered plaintiff to be substantially limited from working generally, or from performing a class of jobs or a broad range of jobs in various classes, as required to establish that Upstate Niagara regarded plaintiff as disabled within the meaning of the ADA.

Upon full consideration of the record presented on this motion, viewing the evidence in the light most favorable to plaintiff, and drawing all reasonable inferences in his favor, the court concludes that plaintiff has failed to establish that he was an "individual with a disability" within the meaning of 42 U.S.C. § 12102(1), as required to establish a *prima facie* case of disability discrimination under the ADA.  Accordingly, no reasonable jury could find in favor of plaintiff on his ADA claim, and defendant is entitled to summary judgment dismissing that claim as a matter of law.

## III.    The NYSHRL

Because the same analysis of plaintiff's *prima facie* case applies to both his ADA and NYSHRL claims, plaintiff's failure to establish a *prima facie* case of disability discrimination under the ADA requires dismissal of his NYSHRL claim as well.  *See Frontera v. SKF USA, Inc.*, 2010 WL 3241123, at *10 (W.D.N.Y. Aug. 16, 2010); *Sclafani v. PC Richard & Son*, 668 F. Supp. 2d 423, 440 n. 10 (E.D.N.Y. 2009); *see also Baker v. CSX Transp., Inc.*, 546 F. Supp. 2d 90, 101 (W.D.N.Y. 2008) (where district court has dismissed all claims over which it has original jurisdiction, court may decline to exercise supplemental jurisdiction over state law claims).

Accordingly, defendant is entitled to summary judgment as a matter law dismissing plaintiff's claim for relief under the NYHRL.

## <u>CONCLUSION</u>

For the foregoing reasons, defendant's motion for summary judgment (Item 49) is granted, and plaintiff's complaint is dismissed in its entirety.  The Clerk of the Court is directed to enter judgment in favor of defendant.

So ordered.

\s\ John T. Curtin
JOHN T. CURTIN
United States District Judge

Dated:  4/3/2013
p:\pending\2008\08-738.mar25.2013